**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Dugan*, **Slip Opinion No. 2024-Ohio-5118.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5118

DISCIPLINARY COUNSEL *v*. DUGAN.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Dugan*, Slip Opinion No. 2024-Ohio-5118.]**

*Attorneys—Misconduct—Violation of the Rules of Professional Conduct—Conditionally stayed one-year suspension.*

(No. 2023-1095—Submitted July 23, 2024—Decided October 29, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2023-023.

_____

The per curiam opinion below was joined by FISCHER, DEWINE, DONNELLY, STEWART, and DETERS, JJ. KENNEDY, C.J., concurred in part and dissented in part and would impose a one-year suspension, with six months conditionally stayed, in accordance with *Disciplinary Counsel v. Bunstine*, 2013-Ohio-3681. BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Vincent A. Dugan Jr., of Columbus, Ohio, Attorney Registration No. 0025982, was admitted to the practice of law in Ohio in 1983. He acknowledges that while representing a vulnerable client pro bono in her divorce and protection-order cases in 2022, he sent her a series of explicit and suggestive text messages and repeatedly solicited sexual activity with her. Before a panel of the Board of Professional Conduct, he admitted that his misconduct violated a professional-conduct rule.

{¶ 2} After he and relator, disciplinary counsel, stipulated to all relevant facts, misconduct, and aggravating and mitigating factors, the board found by clear and convincing evidence that Dugan had committed the charged misconduct. The board urges us to suspend Dugan from the practice of law for one year but stay his suspension in its entirety on the condition that he commit no further misconduct. It also proposes that he pay the costs of this proceeding. No objections have been filed. For the reasons that follow, we adopt the board's findings of misconduct and recommended sanction.

## I. DUGAN'S MISCONDUCT WITH HIS CLIENT

{¶ 3} Since this court admitted Dugan to the practice of law over four decades ago, he has primarily practiced in the area of domestic relations. As part of his practice, he usually takes on 10 to 15 cases pro bono per year.

{¶ 4} In August 2022, a judicial officer referred a client who was otherwise unable to hire a lawyer to Dugan. He agreed to represent the client pro bono in her pending divorce. He later explained that he had been moved to do so out of sympathy because she had a long history of abuse in her romantic relationships.

{¶ 5} The day after he agreed to represent the client, Dugan began to exchange text messages with her. Around midnight, after discussing some details about a hearing to obtain a protection order, he sent her a series of lewd messages. He told her about his sexual preferences and asked her what sex positions she

preferred. Dugan admits that he sent this series of messages and other messages thereafter to solicit a sexual relationship with the client.

{¶ 6} Over the following weeks, Dugan continued to solicit sexual activity with his client. For example, several days after his initial overture, he sent her a text message offering to give her a chest massage. A few days after that, he sent her a text message saying that he was feeling "[r]eally horny" that night. Throughout September and October, calling her "baby," he repeatedly suggested that she come over to his residence, overtly or implicitly urging her to have sex with him.

{¶ 7} In mid-October, the client started accusing Dugan of ignoring her because she had rejected his sexual advances. Dugan represents that up to that point, he had no memory of many of the earlier text messages, claiming that he had sent them while drunk. The parties have stipulated that the client decided to keep Dugan as her counsel because his representation was pro bono and it appeared that they were close to resolving her divorce.

{¶ 8} The client's divorce was finalized on December 30. However, on December 1, she filed a grievance with relator alleging that Dugan had made sexual advances, tried to sexually assault her, and consistently berated and swore at her. Relator sent Dugan a letter of inquiry in January 2023 concerning the grievance. Dugan responded on March 7 with a 13-page letter discussing the history of his representation of the client and explaining his perspective on the allegations in the grievance. In the letter, he also denied attempting to commit sexual assault but admitted to engaging in "sexual wordplay" with the client.

{¶ 9} In July, relator filed a complaint with the board. Dugan initially did not respond to the complaint, so the board filed a certification of default in this court. We ordered Dugan to show cause why we should not adopt the board's recommendation. He objected to the default, claiming that he had missed the deadline to file an answer to the complaint because he had been hospitalized to

undergo open-heart surgery. We sustained Dugan's objection and granted him leave to file an answer. 2023-Ohio-3773.

{¶ 10} Relator and Dugan submitted stipulations of fact, misconduct, and aggravating and mitigating factors, along with 21 stipulated exhibits. The matter proceeded to a hearing before a three-member panel of the board. The panel issued a report finding by clear and convincing evidence that Dugan's conduct violated Prof.Cond.R. 1.8(j) (prohibiting a lawyer from soliciting or engaging in sexual activity with a client unless a consensual sexual relationship existed between them prior to the client-lawyer relationship) and recommending that we suspend him from the practice of law for one year, fully stayed on the condition that he commit no further misconduct. The board adopted the panel's findings and recommendations. We again ordered Dugan to show cause why we should not adopt the board's recommendation. Dugan did not file objections to the report or any other response to the show-cause order. We adopt the board's findings of misconduct.

## II. ASSESSING THE SANCTION

{¶ 11} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the attorney violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

### A. Dugan's violations betrayed his client's trust

{¶ 12} There is no doubt that Dugan's series of text messages soliciting sex from his client violated the ethical duty set forth in Prof.Cond.R. 1.8(j). While there is no evidence of actual sexual contact in this case, the rule does not differentiate between soliciting sex and having sex with a client. *See Disciplinary Counsel v. Russ*, 2023-Ohio-1337, ¶ 20.

{¶ 13} Prof.Cond.R. 1.8(j) stems from the lawyer's duty to act with integrity and to guard carefully the client's trust and confidence in her lawyer. *See*

Prof.Cond.R. 1.8, Comment 17.  Violations of this rule cause "inherent harm" to the client's trust in her lawyer, the attorney-client relationship, and, in turn, the public perception of the legal profession.  *Disciplinary Counsel v. Sarver*, 2018-Ohio-4717, ¶ 29-31.

{¶ 14} The power imbalance between lawyer and client almost invariably leads to an "exploitation of the lawyer's fiduciary role."  Prof.Cond.R. 1.8, Comment 17.  Even the hint of a sexual advance to a client """perverts the very essence of the lawyer-client relationship."' "  *Disciplinary Counsel v. Bunstine*, 2013-Ohio-3681, ¶ 31, quoting *Disciplinary Counsel v. Moore*, 2004-Ohio-734, ¶ 15, quoting *In re Disciplinary Proceedings Against Gibson*, 124 Wis.2d 466, 474-475 (1985).  Such sexual advances could raise in the client's mind the "disturbing" image of an attorney who expects "sex in lieu of fees."  *Disciplinary Counsel v. Krieger*, 2006-Ohio-1062, ¶ 29.  Plus, as here, the client might reasonably worry that her failure to comply with her lawyer's sexual advances might incentivize the lawyer to advocate less zealously for her case.  The lawyer's emotional involvement with the client may also impair the exercise of the lawyer's independent professional judgment.  Prof.Cond.R. 1.8, Comment 17.

{¶ 15} And though harm to the client is of central concern, attorney misconduct has the ancillary effect of undermining the public perception of the legal profession.  *See Cincinnati Bar Assn. v. Hennekes*, 2006-Ohio-3669, ¶ 13; *see also* A Lawyer's Creed, Gov.Bar R. Appendix V ("I recognize that my actions and demeanor reflect upon our system of justice and our profession, and I shall conduct myself accordingly.").  Because of the role lawyers play in good governance, it is imperative that lawyers act above reproach to inspire the public's trust in the law and the legal system.  An attorney's lurid failure to act with integrity may catch the media's attention.  The sanctions we impose therefore protect the public from the attorneys who are unworthy of the trust and confidence essential to the attorney-client relationship.  *See Disciplinary Counsel v. Agopian*, 2006-Ohio-6510, ¶ 10.

{¶ 16} Dugan recognizes the wide-reaching negative results of his misconduct. During his disciplinary hearing, Dugan stated that he was humiliated when he read the messages that he had texted to his client while he was drunk. He acknowledged that these text messages cast a pall on the client's trust in him and that she believed he was not zealously advocating for her interests and was trying to get rid of her as a client after she refused his advances. He also realized that his actions embarrassed the practice of law and undermined any positive legacy he had hoped to create. Based on these admissions, we find that Dugan is aware of the gravity of his misconduct, the importance of the duty he violated, and the necessity for suitable sanctions.

### B. Dugan's aggravating and mitigating factors balance out

{¶ 17} In addition to Dugan's misconduct, the parties stipulated and the board found that three aggravating factors and three mitigating factors are present in this case. As for aggravating factors, first, Dugan has previously been disciplined. *See* Gov.Bar R. V(13)(B)(1). Over 15 years prior to the misconduct at issue here, Dugan approved of a website that advertised his services with a misleading claim and offered a coupon for a 10 percent discount on his first consultation fee. He also employed a suspended lawyer as a paralegal without registering her employment with relator. When confronted, Dugan immediately removed the misleading claim and the coupon from the website. We concluded that a public reprimand was the appropriate sanction for his misconduct. *Columbus Bar Assn. v. Dugan*, 2007-Ohio-2077, ¶ 17. These prior disciplinary offenses lend severity to Dugan's current case, but the weight of those offenses is lessened because Dugan committed them over 15 years ago and they do not involve the type of misconduct that is presently at issue.

{¶ 18} Second, Dugan acted with a selfish motive. *See* Gov.Bar R. V(13)(B)(2). He was motivated by a selfish desire for his client to appease his prurient interests. Further, the timing of many of Dugan's text messages to the

client demonstrates a particularly perverse selfishness. He sent several messages late at night, long after normal business hours. Some messages were interjected into discussions about the client's case or her sharing her concerns about her estranged spouse. The timing of these messages shows Dugan's selfishness at times when his client needed his support as her lawyer. This factor therefore weighs heavily against Dugan.

{¶ 19} Third, Dugan's client was vulnerable at the time of his solicitation, and Dugan knew this. *See* Gov.Bar R. V(13)(B)(8). She came to him seeking an attorney who would represent her pro bono because she was unable to afford a lawyer. He stipulated that despite her discomfort with the sexual nature of his messages, she continued with his representation because he was representing her pro bono and she was afraid that she would not be able to secure other representation. Additionally, in his March 7, 2023 letter to relator, Dugan explained that his client had a history of repeated abusive relationships and that her description of that history was "the most amazing tale" that Dugan had ever heard in his 40 years of practice. When he started soliciting her for sex, she had enlisted his services in the midst of a contentious divorce from her third abusive husband. She had claimed to be afraid of her then-husband. Although Dugan should have been concerned about and cautious with such a vulnerable client, he instead sought his own gain. We have often found attorneys taking advantage of clients' vulnerable circumstances for the attorneys' own sexual gratification to be cause for relatively severe sanctions. *See Sarver*, 2018-Ohio-4717, at ¶ 17-22 (collecting cases).

{¶ 20} But the board found three mitigating factors as well. First, without prompting from either relator or the board, Dugan sought other interim rehabilitation. *See* Gov.Bar R. V(13)(C)(8). At his disciplinary hearing, Dugan explained that he began drinking heavily when his long-term partner suddenly died in February 2021 after a drug overdose. When his client first started raising

different allegations against him, Dugan claimed that he looked back over some of his text messages and could not remember "a lot of them" because he was drunk at the time he sent them. Dugan asserted that he took his client's accusations and the nature of his messages as a wake-up call. He credited the client with helping him stop drinking alcohol.

{¶ 21} The shift in Dugan's conduct has been dramatic. In addition to independently stopping drinking in October 2022, Dugan has resumed attending his church and sought out the support of friends and family. He also has instituted new policies in his law practice, including keeping the door to his office open when meeting with clients, scheduling all meetings with clients before 3:00 p.m. on weekdays, and refraining from texting clients after 7:00 p.m. except to apprise a client of a hearing when he had been unable to reach the client during the day.

{¶ 22} After over a year of sobriety, Dugan submitted to an assessment conducted by the Ohio Lawyers Assistance Program ("OLAP"). In a letter to relator, the clinical director of OLAP concluded that Dugan appeared "to be maintaining successful sobriety" and had "established a robust support system through his involvement in church and close relationships with family members." Given this progress, the clinical director concluded that "[t]here is no need for further OLAP involvement at this time."

{¶ 23} Second, Dugan made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings. *See* Gov.Bar R. V(13)(C)(4). Although Dugan's March 7, 2023 letter to relator hinted that he partially blamed his client for his own actions, he never denied his own culpability. And later, at his disciplinary hearing, he rescinded any potential blame of others and instead blamed himself completely for his misconduct. He acknowledged that his drinking had aggravated his indiscretion in sending the offending text messages, but he never hid behind drinking as an excuse for his actions. Dugan has accepted

8

responsibility for his misconduct and any sanctions that might follow. He has also expressed genuine remorse for his misconduct, supported by measurable change.

{¶ 24} Third, Dugan submitted evidence of his good character and reputation. *See* Gov.Bar R. V(13)(C)(5). Letters submitted on his behalf indicate that he has consistently supported the legal community, his family, and his friends. Though the death of his partner does not excuse his abuse of alcohol or his client's trust, the support of those who have known him for approximately 40 years or more, plus his independently seeking rehabilitation, suggest that Dugan's time of heavy drinking was a dark blip in his career.

## C. Similar cases suggest that the board's proposed sanction is appropriate

{¶ 25} Our sanctions for inappropriate sexual comments or conduct generally have ranged from a six-month to a two-year suspension, with part or all of the suspension stayed, depending on the severity of the misconduct and the presence of aggravating and mitigating factors. *Bunstine*, 2013-Ohio-3681, at ¶ 32 (collecting cases). We agree with the board that Dugan's misconduct warrants a suspension falling in the middle of this range.

{¶ 26} In reaching its recommended sanction, the board considered four cases that each reflect misconduct similar to Dugan's—that is, cases involving soliciting sexual activity from a vulnerable client in which no sexual relationship occurred.

{¶ 27} Three of these cases involved more egregious conduct and proportionately harsher sanctions than what the board recommended here. In *Bunstine*, the attorney suggested to a vulnerable client that he would come to her home and that she should answer the door naked as payment for his legal fees. *Id.* at ¶ 2. We suspended him for one year, with six months conditionally stayed. *Id.* at ¶ 34. As in this case, Bunstine had previously been disciplined but had not shown a pattern of sexual solicitation or activity with one or more clients, *id.* at ¶ 33. But

while Dugan has been truthful in these disciplinary proceedings, Bunstine was not, *id.* at ¶ 29.  It is appropriate, then, to sanction Dugan less severely than Bunstine.

{¶ 28} In another case, the attorney exhibited a cooperative attitude toward the disciplinary proceedings against him.  *Disciplinary Counsel v. Detweiler*, 2013-Ohio-1747, ¶ 12.  But while Dugan's misconduct primarily involved soliciting his vulnerable client for over a month by sending lewd text messages, Detweiler did not just solicit sex from his client through text messages but also escalated his persistent unwelcome activity by sending her a nude picture of himself, *id.* at ¶ 7, 20.  Additionally, we had reprimanded Detweiler not three years prior for developing a sexual relationship with a client.  *Id.* at ¶ 17, citing *Disciplinary Counsel v. Detweiler*, 2010-Ohio-5033, ¶ 5.  Dugan's sanction should therefore be less severe than the one-year suspension Detweiler received.  *See id.* at ¶ 21.

{¶ 29} Finally, in *Russ*, the attorney sent multiple text messages soliciting a sexual relationship with a vulnerable client.  *Russ*, 2023-Ohio-1337, at ¶ 4, 6-8.  Unlike Dugan, Russ denied any wrongdoing until he learned that disciplinary counsel had obtained his text messages, *id.* at ¶ 9-11.  Russ also made false statements in the course of the investigation to shift blame toward his client.  *Id.* at ¶ 11.  Additionally, while Dugan has intentionally sought support to avoid offending again, we found that Russ required the intervention of a qualified healthcare professional, *id.* at ¶ 21-22.  The support network Dugan has established assuages any concern that he remains a danger to the people of Ohio.  *See Agopian*, 2006-Ohio-6510, at ¶ 10.  It is therefore appropriate that he receive a sanction less severe than Russ's two-year suspension with one year conditionally stayed.  *See Russ* at ¶ 23.

{¶ 30} The board also considered one case that involved a sanction less severe than it recommended here.  The attorney in that case, during the course of a recorded telephone conversation, asked a client about her breast size, suggested that she should reward him by showing him her breasts, and solicited her to perform a

sexual act on him. *Akron Bar Assn. v. Miller*, 2011-Ohio-4412, ¶ 6. Miller was charged with a violation of Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law), *id.* at ¶ 1—not with a violation of Prof.Cond.R. 1.8(j) like Dugan was. We sanctioned Miller with a fully stayed six-month suspension and one year of probation conditioned on continued successful medical treatment. *Id.* at ¶ 20. Notwithstanding Dugan's eventual contrition, because his misconduct continued beyond a single conversation, his sanction should be more severe than Miller's.

**{¶ 31}** Dugan sent his client a series of explicit and suggestive text messages. He has never denied this. His comments were inappropriate and particularly egregious given the client's vulnerability. But while many other disciplined attorneys have obfuscated or denied culpability, Dugan has accepted responsibility for his wrongdoing. And while some disciplined attorneys continue to offend until disciplinary action is taken against them, Dugan recognized that he had a problem and amended his ways long before disciplinary proceedings were brought against him. We agree with the board that Dugan's honest testimony, genuine remorsefulness for his misconduct, and measurable change render its recommended sanction sufficient to protect the public.

### III. CONCLUSION

**{¶ 32}** Accordingly, Vincent A. Dugan Jr. is suspended from the practice of law in Ohio for one year with the entire suspension stayed on the condition that he commit no further misconduct. If Dugan fails to comply with the condition of the stay, the stay will be revoked and he will serve the full year-long suspension. Costs are taxed to Dugan.

Judgment accordingly.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond and Benjamin B. Nelson, Assistant Disciplinary Counsel, for relator.

Ulmer & Berne, L.L.P., and Alvin E. Mathews Jr., for respondent.

_____